Good morning, and may it please the Court. My name is Susan Oxford. I represent the EEOC as appellant in this matter, and I'd like to reserve seven minutes of my time for rebuttal. A tribe cannot excuse a private employer from compliance with federal law, and another federal agency cannot excuse an employer from compliance with federal law when Congress has spoken. Would you be making the same argument if the Navajo Nation were doing the mining itself? It's not clear. Under Title VII, a tribe as an employer is excused from the scope of Title VII's reach. There's actually one EEOC decision from many years ago in which we said if a tribe was engaged in a commercial enterprise, we might see that differently, that we saw that the Title VII exemption of tribes as exempting governmental activities, and most of the cases have had to do with governmental entities. But so is this then a governmental activity or commercial enterprise in the EEOC's view? Here, it's a private employer. I know that, but I'm back to my hypothetical question, is would you be taking the same position if the tribe were doing its own mining rather than through a private intermediary? I can't answer that question because it's not been clearly decided in any EEOC regulation or any prior case. Okay. Okay. The district court ruled that what this Court already held in Dau-Uvendua I violates Title VII as national origin discrimination, is lawful by renaming it a political classification and relying on the Supreme Court's analysis in Morton v. Mankari. Whatever implications the political classification construct might have in other contexts, it does not work here. And the district's decision, the district court's decision must be reversed because it does not prevent, present an appropriate analysis for overturning what this Court already held in Dau-Uvendua I. Well, what about Dau-Uvendua II? Right. I was just going to ask the same thing. We've got dueling cases, it seems to me, separated by a Roman numeral. Yes. In Dau-Uvendua II, this Court said that the Navajo Nation may have defenses that it could present to a tribal preference such as this. And this Court listed three potential defenses that it said it had not yet determined were adequate. One is whether the 1868 treaty between the nation and the United States might provide a basis for a preference, and it does not. And I don't think that there's even a really strong argument here. Certainly, the Department of Interior is not arguing that the treaty provides a basis. The Federal policy towards tribal self-government is another defense that this Court identified in Dau-Uvendua II. And again, this case does not pertain to self-government. I want to ask you a question about that. The Navajo Nation is leasing land over which it has some control. The United States also has some control as a trustee. Why isn't that a governmental function? Why isn't that the equivalent of the State of California leasing State land? Why isn't that something that a government does and can condition upon the – a preference for its own citizens? We have to separate out the activities that are happening here. The Navajo tribe approved the lease, and so that would be a tribal governmental function that there's land the tribe has control over and it leases it, it approves that lease. But the activity going on here are jobs that involve mining, mining coal. Well, let me go back to my other example where there is another political entity. Let's say a city or a State, not affiliated with an Indian tribe, but just as a political entity, leases land. Can a city or a State lease that land, let's say a park for a concession to start a golf course or something? Can they condition it on a preference for citizens of that location? In other words, let's say the City of Portland might say we're lacking in jobs and we're going to now lease out this lovely parkland for development as a golf course, but only if Portlanders get some preference in employment, because we need to do that for our citizens. Is that a violation of Title VII? That's another question I can't answer because I'm not aware of an EEOC case or regulation that addresses it directly, but I know suits like that have been brought. And my understanding is that courts have said if there's not a disparate impact based on the residency requirement, that that might be lawful. But that, in fact, if what a town is doing, for instance, I believe there was a lawsuit brought by the NAACP against a town that abuts Newark, New Jersey, saying that if you have a preference limited to the residents of your city and residents of Newark who are predominantly black are being locked out of those jobs, that has a disparate impact and would violate Title VII. But there are areas where those kinds of things are regularly allowed. For example, state universities give preferences to state residents. And there are some other issues that could arise, but that particular one I'm not aware is a violation of Title VII. And I'm having difficulty understanding why that isn't a type of governmental function to say we will give an advantage to our own citizens or to those who live within our borders. I think if we just redirect, if I could redirect the Court's attention to what's at issue here. We are talking about jobs that by an employer who is clearly covered by Title VII and Congress has spoken that in that context there are certain restrictions that jobs cannot be prohibited or preferred in a way that creates national origin discrimination. In that specific context, Congress also said that we understand it would be a good thing to allow Indians to have preference for jobs when the jobs are on or near a reservation and the Indians live on or near the reservation. Congress thought about this and they spoke. And Congress has said that an Indian preference is what would be lawful in this situation.  Sotomayor Well, they thought about part of the problem. I'm not sure about whether they thought about this particular problem. I mean, the Indian preference that's in the statute is an answer to a certain aspect. Are you saying that that's necessarily the answer to all of the Indian preference questions that can arise, including the one in this case? I believe it is an answer to the one that arises in this case, and I don't know if it is the one that arises in this case, but I think it addresses the question that the Court has posed this morning. But I think it directly addresses this particular situation. Well, it addresses it only by not saying anything about it. Your argument is a negative pregnant. You're saying, well, Title VII explicitly saves out from Title VII's prohibition preferences for Indians. Title VII says nothing about preferences for Indian tribal members. And you're saying, but because they've expressed them with respect to Indians irrespective of tribe, that's the only exception Congress intends to give with respect to Indians. I mean, that's your argument. But now you're raising the issue that this Court did decide in Daua Vendua I. Yeah, but then backed off in Daua Vendua II. Only by saying that there could be defenses that might come forward, that the Court had not passed judgment on whether there were any defenses that the Indian tribe might raise. So there's only the very narrowest, it seems to me, holding that survives out of that pair of cases, which would be that in theory, a tribal preference could equate to national origin discrimination. Although I have, I will have to tell you, I have difficulty squaring that with Mankari. Even that surviving holding, but I, is there anything more that survives from our pair of cases that I can't pronounce? Daua Vendua, I think that it does much more than Your Honor is giving it credit for. The, in Mankari, the Supreme Court was looking at a very small, unique situation, and that is jobs that were themselves political, because it was the branch of the United States government that was dealing directly with the tribes, the hundreds of federally recognized tribes, and the government saying that it was permissible, that Congress permissibly gave a preference for Indians, as defined by a person who's a member of any tribe whatsoever, to have those jobs in the Bureau of Indian Affairs, because those were the political arm of the government relating to the political entities of the tribes around the nation. In that context, and in, only in the constitutional analysis and not in the Title VII analysis, did the Supreme Court say that this is like the requirement that a senator live in the state he represents, and therefore it's like a political classification, not a, not a racial classification. But here, this Court already said that if you give preference to a member of one tribe over a member of another tribe, that's national origin discrimination. And what the Court left open in Dawa Vendua too is that there might be a defense, but none of those defenses have been adequately presented here. So what do we do with the Department of Interior's arguments? The Department of Interior's wrong. They have a wrong. Why? That's a lot of money. They put on some pretty compelling arguments. They, well, first of all, they rely heavily on a misreading of Mankari, but we addressed that in our brief. They argue that the longstanding practice of the Department of Interior to approve these lease provisions itself provides the authority to continue doing so. But they quickly did. They approved these provisions before the adoption of Title VII. Right. And then Congress changed the legal landscape when it adopted Title VII. And the Department of Interior did not change its practices. So when Congress did adopt Title VII, your response, I guess, would be that they dealt, they tried to deal with Indian preferences through the Indian provision. Correct. And it's clear, if you look at EEOC's 1988 guidance, where we talk about the regulations of other Federal agencies who likewise were construing the phrase Indian preference, as this Court did in Dawa Vendua I, to mean any Indian over any non-Indian, but not a member of one tribe over another tribe. And the Department of Interior, their own regulations at that time, also acknowledged that an Indian preference is Indian versus non-Indian, not allowing for tribes. And it was only by a passage of a further congressional act in 1994 that the Department of Interior was able to take the language, Indian preference, and when Congress said, but you can have tribal preferences, at that point, Interior started to, was able to approve tribal preferences under a statute that before that time had said Indian preferences, and Interior's own regulations had limited those preferences to those for an Indian over a non-Indian. And the other thing is, this whole situation is kind of odd when you have one arm of the government arguing one thing and the other arm arguing something entirely that's at odds. I mean, this is a long-time practice that the Department of Interior had established of allowing for tribal preferences in this particular kind of setting. And I understand that they believe that they are effectuating self-determination of tribes, but the problem is, and this is why this is such a critical issue for the EEOC, there are tribes that live in contiguous geographic areas. And, for instance, as I'm sure this Court is aware, the Hopi Reservation is a very small area of land that is in the middle of the Navajo Reservation, which is the largest reservation in the United States. The Hopi Reservation, the Navajo Reservation is ten times larger than the Hopi Reservation. The 11,000 members of the Hopi tribe rely heavily on being able to travel into the Navajo Reservation for their employment opportunities. And that is why it's so critical that when Congress spoke, as it did in Title VII, and said that the preference should protect the access of jobs by Indians, by Native Americans, that this Court give full effect to that by not permitting the Department of Interior to continue to allow one tribe to preserve jobs against another. I want to follow up on Judge Paez's question a little bit farther, which is the peculiarity of having two branches of the Federal government arguing opposite sides of the case. To whom do we owe deference, if anyone? I mean, we're often in a situation in which we're expected to give some extra measure of consideration to the government's analysis by means of various forms of deference that have been judicially created. But here, it seems to me, we not only have the dueling executive branch agencies, if you will, but we have potentially dueling deference as to so ultimately how do we resolve that, or do we just have no deference to anybody because we have to decide this competing claim? The Department of Interior relies on a statute that says only they can approve leases. And they've adopted regulations to implement the Indian Mineral Leasing Act. And those regulations say, use our forms. Neither the statute nor the regulations give any authority to have a tribal preference. And so the Department of Interior authority rests solely on the fact that they have an administrative practice that is not reflected in any statute. Well, that's not entirely true. They are also charged with dealing with Indians in a broader way. They are. But the EEOC is charged with implementing Title VII in which Congress specifically thought about this issue, this specific issue. But, see, that's where Moncari gets in your way, it seems to me, because it really puts Title VII in the back seat in regard to employment of Indians, that it seems to suggest that Title VII is not necessarily the answer. Let me ask you a different question, but clearly related to what we've just been talking about. Do you read Title VII's exclusion of Indian preferences as to require tribal membership for it to qualify as an Indian preference under the Title VII exclusion? No. We addressed that in our 1988 guidance. It's a separate section in that guidance. So Indians more broadly defined than merely tribal members? Right. Where someone has that national origin and that character. Are you happy to see that? That cuts against you because that says that Title VII will accept out from its coverage something that would otherwise be a nonpolitical classification. And here what the tribe is relying on and the Interior Department is relying on is a political classification such that maybe it was never touched by Title VII. And Title VII's exclusion in saving out the Indian preference was saving out not a political preference, but a national origin preference. How do you respond to that? I have two responses. One is that I think that Title VII definitely thought about tribes, different tribes, and whether or not there would be a — it would further the civil rights goals of Congress or not further them if preference was given to one tribe over another. And so in our guidance we actually addressed that question about whether or not a tribal preference will further Title VII's laudable goals. And we said, no, it will not because where there are tribes, as here, that are located near each other. It allows the opportunity of just what Congress was trying to prevent, that one group of citizens would prevent another group from access to jobs, that the idea is the equal access to jobs. And the — to get back, Judge Graber, to your comment about Mankari and that it seems to put Title VII on a back burner. In fact, in the Title VII analysis in that case, the Court notes that what — there was a preexisting statute that expressly said Indians get preference in the Bureau of Indian Affairs jobs. And the question before it was whether Congress had overturned or repealed that statute when it adopted Title VII, when it extended Title VII to all of the Federal government. And for five reasons, the Court said, no, it did not, including that Congress the next year had adopted yet another Indian preference in another context. And so the Court looked expansively, had five separate reasons why Congress, when it adopted Title VII expansion to the Federal government generally, was not undermining a separate congressional act. That is not what we have here. Department of Interior is just relying on longstanding practice. And the implications, if it were to put into leases an Indian preference over a tribal Indian preference, there would be little negative impact on Navajo access to jobs because they comprise such a large majority of the Indians in that area. It would — what it would do is have a tremendous impact on the 11,000 Hopis who are also seeking access to those same jobs, that they would actually have some of the jobs opened up to them. I see I have very little time left, if I may say this. May it please the Court. I believe we have reserved 10 minutes. Yes. It's 10, 5, and 5. 10, 5, and 5. And I would like to begin with how my colleague from the EEOC began her argument by saying that it is characterizing our position as being one that where a tribal lease and the policy of a Federal agency can excuse compliance with the law or can excuse something that otherwise violates the law. And that is a fundamental misunderstanding of our position. We are not arguing that the preference here is implicitly exempt from Title VII. We are arguing that it doesn't violate Title VII in the first place because it is not, in this context, national origin discrimination. And so, and because it is not national origin discrimination in the first place, there is no need to get to the question. Because it's a political entity in the Moncari sense. That's correct, Your Honor. And there's really, there's two key features to the Mancari analysis, I think. First, the preference, at least with respect to the sort of the core justification that Morton v. Mancari gave, should be for a, for membership in a sovereign political entity, something akin to citizenship, as opposed to some kind of class. It's like the University of Nebraska saying we give preference to Nebraska students. Correct. But then I think there's a second additional very important requirement of Morton v. Mancari, which is that the preference also has to be sufficiently related to the fulfillment of the United States' unique trust responsibility to federally recognized tribes and their members. That is also an important part. And the tribal mineral leases that are at issue in this case could not be more at the center of the fulfillment of the trust responsibility that the United States has to Indian tribes. To what extent, if any, do you rely on the Navajo Hopi Rehabilitation Act of 1950? We don't rely on it directly because, as the Supreme Court held in Navajo II, that the leases in this case were not issued pursuant to that statute. But we think it is indirectly relevant because, like in Morton v. Mancari, and like in another case, a case called Espinoza that's cited in the briefs, a Supreme Court case from 1973 that dealt with whether a citizenship requirement is a form of national origin discrimination. In both Espinoza and Morton v. Mancari, one of the things the Supreme Court did is it looked at what Congress was enacting and approving before the passage of the relevant statute after the passage of the relevant statute. And in both of those cases, the Court said, and this is part of the canon against implied repeal, it was highly unlikely that Congress would be approving these kinds of preferences that all of a sudden make them unlawful and then continue to be approving of these kinds of preferences. You know, I'm very sympathetic to your argument. It seems to me even right. On the other hand, I think you lost that argument in Dawa and Dawa 1. How do you respond to that? I think in Dawa and Dawa 1, the defendant in that case moved to dismiss the complaint in that case on an all-or-nothing argument, basically arguing that all tribe-specific preferences were political preferences and, therefore, could not state a claim for national origin discrimination. The court of appeals in Dawa and Dawa 1 rejected that argument and, therefore, said that the case should not be dismissed. But it did not have any occasion to address the other legal justifications for these kinds of preferences, as the court in Dawa and Dawa 2 recognized at page 1158, where it said, As pointed out by the Solicitor General's brief, the Solicitor General's brief, I might point out this file on behalf of the EEOC. In Dawa and Dawa 1, we only held that a hiring preference policy based on tribal affiliation as described in the complaint stated a claim. As pointed out by the Solicitor General's brief, however, we did not address the merits of the nation's proffered legal justification. But that's just what the SG says. I'm not bound by what the SG says. I am bound by what my prior panel says. And that's – and I'm reading from this Court's decision in Dawa and Dawa 2 at page 1158, where this Court said, We did not address the nation's proffered legal justifications. In particular, we declined to consider whether the nation's treaty, Federal policy fostering tribal self-government, the tribal ordinance, or any other legal defense justified the hiring preference policy. And all of those legal justifications apply here. The treaty, the tribal ordinance, and the fact that this is a Federal policy that is designed to promote tribal self-governance, tribal self-determination, and tribal economic self-sufficiency. Ms. Oxford argued that this really didn't have anything to do with self-governance. Two responses, Your Honor. One is, this Court itself has said that Morton v. Mancari is not limited to policies that promote tribal self-governance per se. And that was in the Alaska Association case from 1982, as well as it's talked about in the Reindeer case, Williams v. Babbitt. It's also – that argument was also specifically rejected in the Antelope case in the Supreme Court that we cited in our brief. So, first of all, Morton v. Mancari is not limited to principles of tribal self-government. But this is about self-government. It is the core of – it is at the core of self-government concerns, because this is about a sovereign entity's ability to control its own land and its own resources in a way that's analogous to the United States' sovereign interest in how its public lands and resources are managed and disposed, something that is at the core of sovereignty. And through the – Well, I guess there are indirect benefits as well to self-governance. And there's – and there's – so it's the ability to – it's the ability to control the sovereign's resources and their land, which were specifically set aside for the tribe by the United States pursuant to treaty and other agreements. But how is that different from the facts of the Salt River Project? That is to say, they're exploiting their own resources. They're not mining coal, but they've got a dam and water project on the reservation. It sounds as though they're doing exactly there what they're doing here. We – I don't think – I would not distinguish the facts of that case, Your Honor. We don't distinguish Agua Bendua I on the facts. I think that – that also involved a lease for – that enabled the tribe to develop its trust land to put it to a particular use for the benefit of the tribe and its members pursuant to Federal statutes and pursuant to secretarial approval. And that's what we have here. Dollar Bendua I's holding is limited because of the – of the nature of the arguments that were presented before it and the arguments that were not presented and the fact that both the tribe and the United States, the two relevant sovereigns here, were not present in the case. Well, I mean, I'll put my concerns just straight on the table, and that is to say it seems to me that our holding in Roman numeral II is somewhat inconsistent with our holding in Roman numeral I. Well, I think there's a – I mean, that's not – that's not something you can do about. I mean, there they are. How do you respond to Judge Graber's question about deference? Yes, Your Honor. Thank you. As we argued in our brief, I think with respect to the Indian law question, that is, whether this – this kind of tribal preference is directly related to the fulfillment of the United States' trust – unique trust responsibility to federally recognized tribes, that question, the Morton v. Mancurry political preference question, I think the agency that deserves deference on that question is the Interior Department. It is the agency that's charged by Congress with responsibility for carrying out the Indian affairs of the Federal Government. So in deciding whether or not the leases touch on the core of self-governance concerns, you're saying that specific issue is a question on which the Interior deserves deference? Yes. Yes, Your Honor. But the question whether tribal citizenship, if that's a word, or tribal membership can equate to national origin discrimination, to the extent that our cases don't answer that, that would be a question for EEOC deference. Well, outside of the Indian context, yes. And that's why, you know, I want to be up front about the nature of our position. It's very contextual. The same preference, if it was – and this is, you know, what the Solicitor General talked about in the briefs in this case. If the same preference, if it was adopted by a private employer off-reservation, not pursuant to a treaty or one of these statutes dealing with tribal mineral leasing, on its own, unilaterally wanted to give a preference to members of one tribe over another, I think we've taken the position that that would constitute or state a claim for national origin discrimination. But where the preference is one that's required by the tribe, pursuant to its own duly enacted ordinance, consistent with Federal policy under a Federal Indian mineral leasing statute approved by the Secretary on reservation for development of the tribe's trust resources, which have been put aside by the United States specifically for the benefit of the tribe and its members, in that context, it is a Thank you. Thank you, Your Honor. We'll have you yield to the next person on your side of the room. Lisa Enfield, Your Honor, representing the Navajo Nation. Let me say at the outset that the Navajo Nation joins in the position of the Department of Interior as briefed in this matter and as argued here today. We speak separately to emphasize that the Navajo preference in employment is reasonably designed to further Navajo self-governance. And in that context, I'd like to direct my remarks today to the Nation's treaty right to exclude and what that involves, and also EEOC's erroneous effort to parse in the Let me start first with the Navajo Nation's treaty right to exclude. The U.S. Supreme Court has interpreted the Navajo Nation Treaty of 1868 confirming this right to exclude. That right to exclude also applies to other Indians, and that's discussed in the legislative history. And the case for that would be Pueblo v. United States, 98 Federal claims, 376 National Claims. I'm not sure this fully answers the question in front of us, but given that the Hopi reservation is entirely, as it were, landlocked, I don't think the Navajo have a right to exclude the Hopi if they're trying to get somewhere outside of the Navajo reservation, do they? No, but that's not the issue here, Your Honor. This case is really not about the Hopi. It's about employment in the context of the Navajo. Well, but you just told me that the Navajo by treaty have the right to exclude, but I don't think they have the absolute right to exclude the Hopi, do they? They do not have an absolute right. That would be Congress, if they were to behave so irrationally, which is not the case here, could certainly limit that. We have the Navajo Nation Bill of Rights, which provides people with due process and equal protection who are anywhere within the reservation. So there's both Navajo positive law and congressional law, for example, through the Indian Civil Rights Act that would come into play in a situation like that. But here what we're talking about is employment on Navajo tribal trust lands for the most important and valuable of Navajo economic resources, in this case coal. And the Navajo Nation clearly has the right, under its 1868 treaty, to condition the entry of people who come in and enter into consensual business relationships with the Navajo Nation, the manner in which they do business. And here that includes a preference for qualified members of the Navajo Nation. The treaty right to exclude is, again, very clear in terms of applying to conditioning the right to do business. The Court recognized that tribal prerogative in this circuit most recently in the Waterwheel case cited in our brief. The Supreme Court also has recognized this many times in the Marion case, in the This right has been characterized as traditional and undisputed, which allows tribes to set conditions upon entry on tribal lands through tribal regulation. And that's what we have here in terms of both the Navajo Nation's own regulation and the Federal Government's policy of allowing and requiring tribal preference and employment in these situations. The Mancari analysis starts with determining whether it's a political preference or some other preference prohibited by Title VII. And Title VII, for relevant purposes of this case, only prohibits discrimination on national origin and race. It does not prohibit discrimination based on membership in a tribe, which is like citizenship. The court in Espinosa, the U.S. Supreme Court, has already held that, and this case is on all fours with that. Also, and I'm going to sum up here because I see my time is already up, the Corte de Len very limited test for tribal self-government and limiting that to purely intramural matters does not apply in the context of a Mancari analysis. And this Court has rejected exactly that argument in Artichoke Joe's. Thank you. Thank you, counsel. And we'll hear last from Mr. Lomax. Members of the panel, may it please the Court. Peabody also joins Interior's political classification Mancari argument, but there is an alternative path for this Court to take that would allow you to uphold the summary judgment grant from the district court without relying on Mancari. We simply distinguish this case from Davao-Hindu I on one important factor, and that is that in Davao-Hindu I, while the leases are mentioned, there's no mention of the role Interior played in that case. The policy that the EEOC is seeking to litigate in this case was premised upon a notion, the 88 policy statement, that tribe-specific preferences were the statute itself was silent on the issue, but it arose in two situations. First, under a tribal ordinance, and second, pursuant to an employer undertaking that voluntarily. Neither of those facts exist on this record. Peabody did not, and the record is undisputed on this point, did not voluntarily adopt a tribe-specific preference. And it did not do so pursuant to tribal ordinance. The ordinance at issue here is the Navajo Preference in Employment Act, and it's not really at issue here. The district court didn't decide the case on that basis. It was enacted in 1985, nearly 20 years after the leases were first entered into. Such a limited holding in this case, and in an alternative way, without getting into the Mankari dispute, would allow, would recognize that 703i exempts tribe-specific preferences when they appear in a lease for tribal lands approved by Interior. It's the conflict between the agencies that animates these cases and distinguishes it from Dallavendula I. Such a holding would be, would reconcile well with the Malabad decision from this Court and Senator Mont's legislative history that Section 703i, with the primary impetus for that legislative enactment, was to preserve then-existing and later-to-be-instituted preference brokerage. So what do we do with the EEOC's argument? I think I recall reading in the briefs that they said, ah, but if you look deeper into the record in Dallavenda I, you will see that the saltwater lease was approved by Department of Interior. You know, to the extent that may be the facts, this Court didn't give any, this Court did not recognize that or draw it as a distinction. We think that's part of the reason that Dallavendula II reigns in and cabins Dallavendula I, because the record was then developed through the Solicitor General's office that there may be a variety of reasons for an employer doing business on tribal lands to have a tribe-specific preference. Your Honor, the, I want to comment on a question that was posed, and that is, you know, what's left of Dallavendula I under this more limited holding? And that is that an employer off the reservation or even near the reservation would still not be able to unilaterally favor members of the tribe. And the reason there, of course, is the fact that there's no approval by Interior of any such leases. We think that Dallavendula II, when it said that there's a federal policy fostering tribal self-governance or that there are any other legal defenses, embraces both the political classification argument as well as the alternative 703i argument. Yeah. Although Dallavendula, the Salt River Project, of course, was located on the Nebo Reservation. So you're saying usually if you're trying to read a case narrowly, you're confining it to its facts. You're trying to confine it to its language and ignore its facts. Well, Dallavendula I is on the reservation. Right. Exactly. So your hypothetical as to what Dallavendula could apply to when you're saying, well, it could still apply to things off the reservation, is not the facts in front of the Court. Well, it could also apply on the reservation if it was on fee lands, Your Honor. Yeah. But, again, this was not on fee land in Dallavendula I. We agree completely. It was not on fee lands. Yeah. That's a different question. This may be a very small tail on a dog. What do we do? What's happened to the record-keeping claim in this case? You know, the record-keeping claim, it was dismissed. The judgment, and it's in the excerpts of record, is clear that it was a dismissal of the claims, plural. Yeah. Was it even thought about? I mean, I don't see it in the district judge's opinion. I see nothing. There's no analysis. I think there's a Ninth Circuit case law, Your Honor, that says that you cannot raise a new issue on appeal to try to rescue a grant to summary judgment as well. And I'm happy to submit that to the Court. I see I've run out of time, Your Honor. You are out of time. Thank you very much. And, Ms. Oxford, you have a little bit of time remaining. Very briefly, the Navajo Nation argues that this is something protected by its treaty, which is one of the potential defenses that this Court recognized in Tawagandua 2. But the only treaty language they can point to is the right to condition entry onto the land, and a tribe cannot condition entry onto its reservation by imposing something that otherwise violates Federal law. So any condition must comport with Federal law, and there's no other express language, no language whatsoever in their treaty that would permit such a requirement as they try to defend here. And I think it's important when the Court wonders how to reconcile Tawagandua 1 with Tawagandua 2, that in Roman numeral 2, this Court was only looking at the Rule 19 question of whether the Navajo Nation was an indispensable party to the lawsuit. And in that context, it was looking to see whether there were any plausible defenses that might be advanced. That's the only context in which this Court asked the question, not whether there was actually some merit to any of those defenses that they raised. And, yes, we are keeping the record claim alive. That was dismissed without any thought on the district court's basis and should not have been rejected. It should not have been dismissed. We'd ask that to be reversed as well. I hesitate to hold you longer, but I'm just trying to – that one little detail bothers me. I want to make sure we handle it properly. I know it's not the centerpiece of the entire case here. It's off to one side. But so was it argued in front of the district judge and he just ignored it? Was it not argued so that it wasn't brought to his attention? Do you know what happened in the district court such that he didn't, you know, he dismissed? I understand the consequence of the overall dismissal. The defendants, to my knowledge, never moved for summary judgment on that claim. And then the court simply dismissed the entire case. So I believe that we called to the court's attention that there was this additional element. I think in every brief we've mentioned that we have the record-keeping claim as well. And have you preserved that record-keeping claim for appeal now? We've mentioned that in our opening brief. I'm quite certain. I have to look at the page. I have to find the picture of that. Okay. Now, the second question. If we were to hold against you, if we were to hold, and this is only a hypothetical at this point, if we were to hold that the Navajo preference is permissible in these leases, does your record-keeping claim have any bite? Do you care about it anymore? I can't answer that question. I don't know the answer to that question. Okay. Thank you, counsel. The case just argued is submitted. And, again, we appreciate the very helpful arguments from all counsel.
judges: Graber, Fletcher, Paez